2020 IL App (1st) 163007-U
No. 1-16-3007

SECOND DIVISION
February 11, 2020
Modified upon denial of rehearing March 24, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 91 CR 9011 |
| | ) | |
| ANTHONY McNEAL, | ) | |
| | ) | The Honorable |
| Defendant-Appellee. | ) | Matthew E. Coghlan, |
| | ) | Judge Presiding. |
| | ) | |

_____

JUSTICE PUCINSKI delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment.

**ORDER**

¶ 1    *Held:* The circuit court properly denied the defendant's motion for leave to file a successive postconviction petition where the defendant's life sentence did not violate the eighth amendment to the United States Constitution or proportionate penalties clause of the Illinois Constitution, since the defendant was an adult offender, his life sentence was discretionary, and he was convicted for the direct participation in a first degree murder.

¶ 2    Defendant Anthony McNeal appeals from the dismissal of his *pro se* motion for leave to

file a third successive petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS

5/122-1, *et seq.* (West 2016)). On appeal, McNeal argues that his natural life sentence violated the

eighth amendment to the United States Constitution and the proportionate penalties clause of the Illinois Constitution, where he committed the offense at age 18, and the trial court failed to consider the circumstances surrounding his youth when imposing his sentence. We affirm.

¶ 3 BACKGROUND

¶ 4 McNeal and co-defendants Evelyn Nieves and Martha Donna Burgos were charged by indictment with three counts of first degree murder (Ill. Rev. Stat. 1989, ch. 38, ¶ 9-1(a)(1), (2), (3)) and one count of armed robbery (Ill. Rev. Stat. 1989, ch. 38, ¶ 18-2(a)), arising from an incident in Chicago on May 25, 1990. The record reflects that Burgos pled guilty to first degree murder and armed robbery, and Nieves pled guilty to armed robbery and agreed to testify against McNeal on behalf of the State.

¶ 5 Because the issues on appeal are limited to McNeal's sentence, we set forth only a brief summary of the facts adduced at trial.

¶ 6 Nieves testified that on May 25, 1990, she lived in Indiana with Burgos and McNeal. Burgos and McNeal shared a bedroom and were in a romantic relationship. Nieves, Burgos, and McNeal had planned a robbery in which Nieves and Burgos would enter a bar in Chicago and take someone at the bar into an alley. Meanwhile, McNeal would park his vehicle nearby and wait for Nieves to "go get" him.

¶ 7 Nieves, Burgos, and McNeal drove to the planned location in McNeal's vehicle; Nieves and Burgos exited the vehicle and walked around; and McNeal parked nearby. William Gonzalez approached Nieves and Burgos in a green vehicle and solicited Burgos for a sexual encounter. Burgos entered Gonzalez's vehicle. Then, Nieves ran to McNeal's vehicle, and McNeal and Nieves followed Gonzalez's vehicle into a dark alley. While following Gonzalez, Nieves got into the driver's seat, and she parked McNeal's vehicle next to Gonzalez's vehicle.

¶ 8    McNeal exited his vehicle with a firearm, pointed the firearm at Gonzalez's face, and told Gonzalez to "get out of the car." Once McNeal pointed his firearm at Gonzalez, Burgos joined Nieves in McNeal's vehicle. Then, Gonzalez exited Gonzalez's vehicle, put his hands up, stated "take the money and don't kill me," and dropped to his knees. McNeal asked where Gonzalez's wallet was, and Gonzalez said it was "in back of his pocket." McNeal looked for the wallet but could not initially find it. Gonzalez tried to stand up, but McNeal hit Gonzalez in the head with his firearm. Then, McNeal found and removed the wallet from Gonzalez's back pocket, stepped back three to four feet from Gonzalez, and shot Gonzalez in the head three or four times.

¶ 9    McNeal, Nieves, and Burgos drove away from the scene. On the way back to Indiana, McNeal removed Gonzalez's identification card and $60 from Gonzalez's wallet, gave the $60 to Burgos, and threw the wallet off a bridge. At their Indiana house, McNeal burned Gonzalez's identification card.

¶ 10    On May 25, 1990, at about 2:15 a.m., two Chicago police officers were driving on patrol and saw a green vehicle, with its side door open and dome light on, in an empty lot near the intersection of Baltimore Avenue and 93rd Street. They pulled over to inspect the vehicle and saw Gonzalez laying face-down on the ground, about five feet from the vehicle. Gonzalez was bleeding from his head, his pants pockets were inside out, and his pants unbuttoned and unzipped. Gonzalez was taken to a hospital. During Gonzalez's autopsy, two bullets and multiple bullet fragments were removed from Gonzalez's head.

¶ 11    In June 1990, Chicago police officer Ronald DiMichele and a detective recovered the barrel of a firearm from a bar where Burgos worked as a bartender. They spoke with Burgos; went with Burgos to the residence of McNeal, Nieves, and Burgos; entered McNeal and Burgos's bedroom; and recovered the frame of a firearm from under a mattress. On November 15, 1990, Nieves went

with DiMichele to a police station and told Chicago police officers about the incident. The next day, officers arrested Burgos and McNeal.

¶ 12    The jury found McNeal guilty of first degree murder and armed robbery.

¶ 13    At the sentencing hearing, the State called multiple witnesses to testify in aggravation. A correctional officer testified that while McNeal was in prison, an inmate reported to the officer that he was held down by McNeal while another person struck the inmate. Another correctional officer testified that two shanks were found under McNeal's mattress in his prison cell. A Joliet police officer testified that in June 1989, she worked at the Joliet Job Corps, a "trade facility for juveniles." There, a man told the Joliet officer that McNeal beat him in the head and face in a hallway, followed him into the man's room, and struck the man's arm and back with dumbbells. DiMichele testified that on June 21, 1990, he spoke with McNeal. McNeal told DiMichele that McNeal had previously given his revolver to another man, who shot someone in the head in McNeal's presence. Nieves testified that on June 21, 1990, she was at the bar where Burgos bartended. There, McNeal screamed at Burgos, pointed a firearm at Burgos, hit a man's head with the firearm, broke the firearm on a candy dispenser, and left with Burgos down an alley.

¶ 14    In mitigation, McNeal's mother, Carolyn Craig, testified that "in the late 70's—80's," when McNeal "was growing up," someone broke into her house and stabbed her twice. Craig described McNeal as "very quiet, nice," and stated that McNeal goes to school and church. Leola Macon, the mother of one of McNeal's friends, testified that McNeal was "very loving," "sympathetic," and "well-mannered," and that "whatever went wrong with Anthony's life, it didn't make sense."

¶ 15    Mary Baldwin testified that her daughter went to school with McNeal, and McNeal was "very kind," "loving," and "liked to play with the kids." When one of Baldwin's children died,

McNeal "help[ed] her [daughter] through it," and McNeal gave Baldwin "a large check to deposit." Baldwin further stated that McNeal lived in a foster home from the age of eight or nine, that McNeal regularly attended church, and that McNeal participated in an "advantaged youth" church program. Moreover, Baldwin added that McNeal suffered emotional abuse at home, and that the children of McNeal's foster mother emotionally and verbally abused him at church. Baldwin also testified that McNeal has "been hurt," that she "believe[d] that all of his good qualities could be awakened in him," and that McNeal "needs love and guidance."

¶ 16    The trial court considered McNeal's presentencing investigation report (PSI), which stated that McNeal was born on December 4, 1971, in Gary, Indiana. The PSI also reflected that McNeal received a GED and completed an automobile mechanics course, and that he did not belong to a "street gang or club." When McNeal was eight years old, his parents separated. McNeal recalled that when he was nine years old, he and his siblings were placed in a foster home. McNeal also started drinking alcohol at age 13 and doing drugs at age 14. At age 17, McNeal went to the Job Corps, and his foster family moved to Alabama without telling him. In the PSI, McNeal's father reported that McNeal's parents were never married, that McNeal was removed from his home due to child abuse, and that McNeal's mother attempted to drown McNeal's brother. McNeal's father stated that McNeal "never had a chance in life."

¶ 17    In closing argument, the State described McNeal as "evil" and asserted that McNeal should receive the death penalty. Defense counsel argued that McNeal was a young man who "fell in with an older woman" who "led him astray." Counsel continued that McNeal got in "the wrong foster home," and "in those wild years" while at work and school got "involved with the wrong people." In allocution, McNeal stated that he had abused drugs and alcohol since he was 13 years old, which "led [him] down the wrong path in life," but was now "drug-free." McNeal asked for the

"opportunity to help [his] son grow up" and be someone who "does not take the turn in life that [he] did."

¶ 18    The trial court sentenced McNeal to natural life imprisonment for first degree murder and a concurrent term of 30 years' imprisonment for armed robbery. The court stated it considered McNeal's "personal history," education, work history, "family situation," and the fact that McNeal had a child. The court noted that McNeal committed armed robbery and murder while "over the age of 18" and was therefore eligible for the death penalty. Nonetheless, the trial court found that the "only just sentence" was natural life imprisonment.

¶ 19    McNeal filed a motion for new trial based on alleged newly discovered evidence, which the trial court denied.

¶ 20    On direct appeal, McNeal argued that the State improperly introduced evidence regarding McNeal's exercise of his *Miranda* rights, that the trial court abused its discretion in denying his motion for new trial based on newly discovered evidence, and that he was denied due process when the State suppressed exculpatory material. *People v. McNeal*, No. 1-92-4180 (1992) (unpublished order under Supreme Court Rule 23).  We affirmed. *Id.*

¶ 21    McNeal filed a *pro se* postconviction petition and supplemental postconviction petition, alleging that trial counsel was ineffective for failing to adequately challenge Nieves's "character" at trial. McNeal also alleged that counsel on direct appeal was ineffective for failing to raise "viable constitutional issues," namely, that the trial court allowed "perjurious testimony" and "inconclusive" evidence, and that the trial court barred evidence of McNeal's prior statement to a detective regarding his innocence. The circuit court dismissed his petition, and we affirmed the dismissal after granting appellate counsel leave to withdraw. *People v. McNeal*, No. 1-97-1579 (1997) (unpublished order under Supreme Court Rule 23).

¶ 22 In November 2000, McNeal filed a *pro se* motion for leave to file a successive petition with an attached petition, alleging that his sentence was based on findings not proven beyond a reasonable doubt, that he was actually innocent based on alibi witnesses' testimony, that trial counsel was ineffective for not presenting the alibi testimony, and that counsel on direct appeal was ineffective for "failing to investigate and subpoena" an alibi witness. After an evidentiary hearing on January 30, 2008, the circuit court denied McNeal's motion, finding that the alibi witnesses' testimony was not newly discovered, and that the evidence would likely have not altered the outcome at trial. McNeal appealed, and we affirmed. *People v. McNeal*, No. 1-08-1700 (2010) (unpublished order under Supreme Court Rule 23).

¶ 23 McNeal moved *pro se* for leave to file a second successive postconviction petition, alleging that he received a copy of defense counsel's "case file" on May 7, 2013, and that his prior lack of access to the file constituted cause and prejudice. The trial court denied his motion, and he appealed. We affirmed the trial court's ruling after granting his appellate counsel leave to withdraw. *People v. Anthony McNeal*, 2015 IL App (1st) 140492-U.

¶ 24 On May 19, 2016, McNeal filed a *pro se* "expedited" motion for leave to file a third successive postconviction petition. McNeal alleged that a natural life sentence without parole, when imposed on an 18-year-old offender without considering the circumstances of the offender's youth, violated the eighth amendment to the United States Constitution (U.S. Const., amend. VIII), as set forth in *Miller v. Alabama*, 567 U.S. 460, 479 (2012), and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). McNeal cited *People v. House*, 2015 IL App (1st) 110580, for the proposition that life sentences imposed against young adults could violate the proportionate penalties clause.

¶ 25    On September 28, 2016, the circuit court denied McNeal leave to file a third successive postconviction petition, finding that *Miller* and its related cases did not apply to McNeal, who was not a juvenile when the offense occurred. The court also found *House* distinguishable, noting that the case concerned a 19-year-old defendant who received a mandatory life sentence after serving as a lookout for a murder, but was not directly responsible for the offense. This appeal followed.

¶ 26    ANALYSIS

¶ 27    On appeal, McNeal asserts that the circuit court erred in denying him leave to file a successive postconviction petition, where the trial court failed to consider McNeal's youth when imposing a natural life sentence, when McNeal was 18 years old at the time of his offense. Thus, McNeal claims his natural life sentence for first degree murder violated the eighth amendment to the United States constitution. The State responds that the eighth amendment only applies to offenders under the age of 18 years.

¶ 28    Under the Act (725 ILCS 5/122-1, *et seq.* (West 2016)), a criminal defendant may "assert that his federal or state constitutional rights were substantially violated in his original trial or sentencing hearing." *People v. Davis*, 2014 IL 115595, ¶ 13. Proceedings on a postconviction petition "focus on constitutional claims that have not and could not have been previously adjudicated." *People v. Holman*, 2017 IL 120655, ¶ 25. Thus, issues that could have been raised previously, but were not, are forfeited. *Id.*

¶ 29    A defendant faces "immense procedural default hurdles when bringing a successive postconviction petition," as the Act contemplates the filing of only one postconviction petition. *Davis*, 2014 IL 115595, ¶ 14. Nonetheless, Illinois courts have recognized that state courts "have no authority to leave intact a sentence that violates *Miller*" in postconviction proceedings, and thus "Illinois' procedural rules regarding forfeiture cannot be applied to juvenile defendants raising

claims under *Miller*." *People v. Nieto*, 2016 IL App (1st) 121604, ¶¶ 37-39. We review the denial of a defendant's motion for leave to file a successive postconviction petition *de novo*. *People v. Miranda*, 2018 IL App (1st) 170218, ¶ 22.

¶ 30 The United States Supreme Court in *Miller* held that the eighth amendment to the United States Constitution "forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." *Miller*, 567 U.S. at 479. "Mandatory life without parole for a juvenile precludes consideration" of the juvenile's age and its "hallmark features," including the juvenile's family and surrounding home environment, the extent of the juvenile's participation in the offense, the effects of familial or peer pressure, the "inability to deal with police officers or prosecutors," the incapacity to assist the juvenile's own attorneys, and the possibility of rehabilitation. *Id.* at 477-78. The United States Supreme Court in *Miller* held that "a judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles." *Id.* at 489.

¶ 31 More recently, the Illinois Supreme Court has held that *Miller* applies to discretionary life sentences without parole for juvenile defendants. *Holman*, 2017 IL 120655, ¶ 40. Our supreme court has also declined to extend *Miller* to offenders who are 18 years of age or older, finding that the *Miller* Court "confirmed that the age of 18 is the legal line separating adults from juveniles," and that the protections of *Miller* only apply to juvenile offenders. *People v. Harris*, 2018 IL 121932, ¶¶ 58-61. Whether a sentence is constitutional is a question of law, which we review *de novo*. *People v. Taylor*, 2015 IL 117267, ¶ 11.

¶ 32 McNeal received a natural life sentence for first degree murder and a concurrent sentence of 30 years' imprisonment for armed robbery. The applicable sentencing provision from the Unified Code of Corrections provides:

"[F]or first degree murder, *** if the court finds that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty or that any of the aggravating factors listed in subsection (b) of Section 9-1 of the Criminal Code of 1961 are present, the court may sentence the defendant to a term of life imprisonment ***." Ill. Rev. Stat. 1989, ch. 38, ¶ 1005-8-1(a)(1).

The aggravating factors that can support a natural life sentence, as referenced in this provision, include where "the murdered individual was killed in the course of another felony," if the murdered individual "was actually killed by the defendant." Ill. Rev. Stat. 1989, ch. 38, ¶ 9-1(b)(6).

¶ 33    The parties do not dispute that McNeal was 18 years old at the time of the offense and was therefore an adult. Accordingly, *Miller* does not apply to McNeal's sentence, and his sentence does not violate the eighth amendment to the United States Constitution. See *Harris*, 2018 IL 121932, ¶¶ 58-61.

¶ 34    McNeal additionally argues that his natural life sentence violated the proportionate penalties clause of the Illinois Constitution. The States responds that this clause is also inapplicable to McNeal's sentence because McNeal was an adult offender, and his life sentence was discretionary and not mandatory.

¶ 35    The proportionate penalties clause of the Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const., art. 1, § 11.

¶ 36    In asserting that his natural life sentence violated the proportionate penalties clause, McNeal primarily relies on *House*, 2015 IL App (1st) 110580 (in which a 19-year-old defendant received a mandatory life sentence). We note that shortly after McNeal filed his opening brief, the Illinois Supreme Court issued a supervisory order vacating *House* in light of its ruling in *Harris*,

2018 IL 121932. See *People v. House*, No. 122134 (Ill. Nov. 28, 2018) (supervisory order). Since this supervisory order, we have issued a modified opinion. See *People v. House*, 2015 IL App (1st) 110580-B.

¶ 37    Either way, we find that *House* does not apply. In the original opinion in *House*, and on remand from the supreme court, this court's ruling was largely premised on the fact that the defendant was sentenced on a conviction that was based on a theory of accountability. *House*, 2015 IL App (1st) 110580; *House*, 2015 IL App (1st) 110580-B, ¶ 32 ("As discussed throughout our previous analysis, defendant's conviction under the theory of accountability weighed heavily in our conclusion that his mandatory natural life sentence shocked the moral conscience of the community."). This court emphasized the fact that the defendant in *House* was not even present at the scene of the murder, but received "the same mandatory sentence of natural life as *** [the] codefendant who participated in the shooting of the victims," while another codefendant was released from the penitentiary during resentencing because he was 17 years old when the offense occurred. *Id.* ¶ 46. We continued to note that a mandatory sentence does not afford a trial court "any discretion if an offender is found guilty of triggering offenses," and the "lack of discretion afforded the trial court for the imposition of a mandatory life sentence is especially relevant when the defendant is a young adult, over 18, but still not considered a fully mature adult." *Id.* ¶ 60. We therefore found that as applied to the defendant, the mandatory natural life sentencing statute at issue violated the proportionate penalties clause, and we remanded the case for a new sentencing hearing so that the trial court could have "the ability to consider the relevant mitigating factors prior to imposing a sentence of such magnitude." *Id.* ¶¶ 65-66.

¶ 38    Here, unlike in *House*, McNeal was not convicted on a theory of accountability, and his natural life sentence was not mandatory. Rather, McNeal was convicted for directly participating

in the shooting of Gonzalez, and he received a discretionary natural life sentence. Therefore, our reasoning in *House* does not apply here.

¶ 39    In his reply brief, McNeal asserts that the distinction between a mandatory and discretion life sentence is not relevant to our analysis. However, McNeal supports this assertion with cases that concerned juvenile offenders bringing eighth amendment *Miller* challenges, and not proportionate penalties claims. *People v. Holman*, 2017 IL 120655 (in which the defendant was 17 years old at the time of the offense and brought an eighth amendment claim pursuant to *Miller* on appeal); *People v. Buffer*, 2019 IL 122327 (in which the defendant was 16 years old at the time of the offense and brought an eighth amendment *Miller* claim on appeal). These cases did not address whether an adult offender could challenge a discretionary life sentence under the proportionate penalties clause.

¶ 40    McNeal sets forth no legal authority supporting the assertion that a discretionary natural life sentence violates the proportionate penalties clause, when imposed on an adult who was convicted for directly participating in a murder. To the contrary of this assertion, this court has recently found that even a *mandatory* life sentence imposed on an 18-year-old offender did not violate the proportionate penalties clause, where the defendant directly participated in the murders for which he was convicted. *People v. Pittman*, 2018 IL App (1st) 152030, ¶¶ 37-40 (distinguishing itself from *House* on the grounds that the defendant was not convicted on a theory of accountability). Here, McNeal was convicted of directly participating in the murder for which he was convicted, as the evidence at trial showed that McNeal shot a man three to four times in the head at close range.

¶ 41    Moreover, we note parenthetically that the record reveals the trial court considered multiple circumstances regarding McNeal's youth. Specifically, the trial court was presented with evidence

regarding McNeal's education and family history, a traumatic experience that McNeal's natural mother experienced while McNeal lived with her, a claim that McNeal's natural mother attempted to drown McNeal's brother, and the abuse McNeal faced at his foster home.

¶ 42    In his petition for rehearing, McNeal asserts that we fail to recognize the significance of *Harris*, 2018 IL 121932, which according to McNeal, supports a finding that a young adult may challenge a discretionary life sentence based on the proportionate penalties clause. However, the Illinois Supreme Court in *Harris* never reached the merits of this issue. In *Harris*, the defendant filed a direct appeal challenging his sentence based on the proportionate penalties clause and eighth amendment. *Id.* ¶ 17. This court found that defendant's mandatory *de facto* life sentence violated the proportionate penalties clause. *Id.* ¶ 18. The State appealed to the supreme court, and the defendant asserted that "as applied to him," his mandatory *de facto* life sentence violated the proportionate penalties clause of the Illinois Constitution. *Id.* ¶¶ 20, 36.

¶ 43    The supreme court in *Harris* observed that the defendant's proportionate penalties claim was an "as-applied challenge," which required "a showing that the statute is unconstitutional as it applies to the specific facts and circumstances of the challenging party." *Id.* ¶¶ 37-38. However, the defendant failed to raise his as-applied constitutional challenge in the trial court, "an evidentiary hearing was not held on his constitutional claim, and the trial court did not make any findings of fact on defendant's specific circumstances." *Id.* ¶ 40. The court stated that "a reviewing court is not capable of making an as-applied finding of unconstitutionality in the 'factual vacuum' created by the absence of an evidentiary hearing and findings of fact by the trial court." *Id.* ¶ 41. The court therefore concluded that the defendant's claim on direct appeal was premature and "more appropriately raised in another proceeding" that allows presentation of evidence not contained in the record, such as a postconviction proceeding. *Id.* ¶¶ 46, 48.

¶ 44    We find *Harris* does not support McNeal's position on collateral appeal—while the supreme court may have held that Harris's as-applied proportionate penalties claim was more appropriate for a proceeding other than a direct appeal, the court made no finding as to how successful the claim would be in postconviction proceedings. *Id.* ¶ 48. The court only held that where a defendant did not raise before the trial court an as-applied challenge to his sentence based on the proportionate penalties clause, a reviewing court could not have made a finding on the merits of the claim, since the record lacked any information regarding the defendant's youth and the challenge was therefore premature for a direct appeal. *Id.* ¶¶ 46, 48.

¶ 45    "[L]eave of court to file a successive postconviction petition should be denied when it is clear, from a review of the successive petition and the documentation submitted by the petitioner, that the claims alleged by the petitioner fail as a matter of law or where the successive petition with supporting documentation is insufficient to justify further proceedings." *People v. Smith*, 2014 IL 115946, ¶ 35. In his motion to file a successive postconviction petition, McNeal raised no facts or circumstances regarding his youth that were not already included in the record, presented at his sentencing hearing, and considered by the trial court. On appeal, he primarily relies on his age in arguing that the proportionate penalties clause entitles him to a hearing on his youth and its attendant circumstances before receiving a life sentence. We reiterate our finding that McNeal has not cited any legal authority supporting a finding that a discretionary life sentence imposed on an 18-year-old defendant, based on direct participation in the crime of first degree murder and imposed after the presentation of a PSI and testimony regarding McNeal's youth, could be found

to violate the proportionate penalties clause. McNeal's claim fails as a matter of law.[1] See *People v. Handy*, 2019 IL App (1st) 170213, ¶¶ 41-42 (finding that the circuit court properly denied the defendant leave to file a successive postconviction petition where the defendant's life sentence did not violate the proportionate penalties cause, because the "defendant was an adult, an active participant in the crimes, and received a discretionary sentence").

¶ 46   We find McNeal's natural life sentence does not violate the proportionate penalties clause where (1) McNeal was not a juvenile at the time of the offense; (2) he received a discretionary life sentence; (3) his conviction was based on his direct participation in the crime of first degree murder, and not based on a theory of accountability; and (4) the trial court imposed McNeal's sentence after considering information from the PSI and testimony that concerned McNeal's youth. Because McNeal's sentence violated neither the eighth amendment to the United States Constitution nor the proportionate penalties clause of the Illinois Constitution, we find the circuit court did not err in denying McNeal leave to file a successive postconviction petition.

¶ 47   CONCLUSION

¶ 48   For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 49   Affirmed.

---

[1] We note that section 5-4.5-115(b) of the Code of Corrections (P.A. 101-288, § 10, eff. Jan. 1, 2020; law located on Westlaw at 730 ILCS 5/5-4.5-115(b)) provides that an offender under the age of 21 who is convicted of first degree murder may be eligible for parole review after serving 20 years or more of the offender's sentence. Nonetheless, this provision is inapplicable here, as it only affords parole review for offenders "sentenced on or after June 1, 2019." *Id.*